Exhibit B

Case 3:02-cv-01847-CFD    Document 49-8    Filed 06/01/2004    Page 1 of 16

                                                           Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF CONNECTICUT

3    ------------------------------x

4    JAMES STUART,                        **ORIGINAL**

5              Plaintiff,

6       -versus-                   : Civil Action No.
                                     3:02 CV 1847 (CFD)

7

     THE SOUTHERN NEW ENGLAND
8    TELEPHONE COMPANY, ET AL,

9              Defendants.

10   ------------------------------x

11

12

13             Deposition of JAMES STUART, taken

14   pursuant to The Federal Rules of Civil Procedure, at the

15   law offices of Ciulla & Donofrio, LLP, 127 Washington

16   Avenue, North Haven, Connecticut, before Patricia Saya,

17   LSR No. 37, a Registered Professional Reporter and

18   Notary Public in and for the State of Connecticut, on

19   March 23, 2004, at 10:05 a.m.

20

21

22

23

24

25

```
                                                        Page 2
 1   A P P E A R A N C E S:
 2           Pro Se:
 3           JAMES STUART
             119 Gem Avenue
 4           Bridgeport, Connecticut  06604
 5           For the Defendant:
 6           CIULLA & DONOFRIO, LLP
             127 Washington Avenue
 7           North Haven, Connecticut 06473
             By:  JEFFREY M. DONORFIO, ESQ.
 8
 9
10   A L S O    P R E S E N T:
11           Stanley Chance
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2   WITNESS              DIRECT    CROSS
 3   JAMES STUART            5       --
 4
 5
 6
 7                DEFENDANTS' EXHIBITS
 8   NO.     DESCRIPTION                    PAGE
     A    Notice of Deposition               11
 9
     B    Letter dated March 16, 2004        18
10
     C    Complaint                          18
11
     D    Defendants' First Set of
12        Interrogatories and Requests
          for Production                     37
13
     E    Handwritten letter to James Stuart
14        from his daughter Monique          44
15   F    Itemized billing summary from
          Roger Williams College             44
16
17   (Exhibits were retained by counsel.)
18
19
20
21
22
23
24
25
```

Page 4

```
 1   J A M E S   S T U A R T,
 2   of 119 Gem Avenue, Bridgeport, Connecticut 06604,
 3   called as a witness, having been first duly sworn by
 4   Patricia Saya, a Notary Public in and for the State of
 5   Connecticut, was examined and testified as follows:
 6   DIRECT EXAMINATION
 7   BY MR. DONOFRIO:
 8        Q.   Please state your full name for the record.
 9        A.   James Stuart.
10        Q.   And what is your present address?
11        A.   119 Gem Avenue, Bridgeport, Connecticut.
12        Q.   Have you ever had your deposition taken
13   before?
14        A.   No.
15        Q.   What I am going to do is just give you some
16   basic ground rules to try to help this move quickly and
17   smoothly, okay?  As you can see, the Court Reporter is
18   taking down all of my questions, and she will, likewise,
19   take down all of your responses.  In order for the
20   transcript to accurately reflect my questions and your
21   answers, there is a few basic rules that we need to both
22   follow.
23             The first is that you should wait until I
24   finish asking a question before you start your answer
25   because the Court Reporter can't take us both down if we
```

Page 5

1  are talking over each other. Likewise, I will not ask
2  my next question until you have completed your last
3  answer, okay?
4       A.   Okay. I understand that.
5       Q.   All of your responses have to be audible. In
6  other words, a nod of the head doesn't show up in the
7  transcript. So if you want to nod your head "yes," you
8  can say "yes." If you want to nod your head "no," that
9  kind of thing, it all needs to be -- keeping in mind
10 that as talented as the Court Reporter is, the
11 limitations are what is audible and what she can hear
12 and what she can follow, okay?
13      A.   Yes, I understand that.
14      Q.   If there is a question that I ask you that you
15 don't understand, you don't have to guess or speculate.
16 It is my job to ask questions that you do understand.
17 So if I ask a question that doesn't make any sense to
18 you or it is a compound question or whatever, just tell
19 me, "Could you rephrase your question," and I will be
20 happy to accommodate you, okay?
21      A.   Yes, I understand.
22      Q.   Likewise, if at any point during the
23 deposition, you want to take a break, if you have to use
24 the men's room or you want a glass of water or need to
25 make a phone call, whatever, just let me know, and I

Page 6

1  will accommodate you. The only exception to that is if
2  I ask a question, you have to answer the question before
3  the break. In other words, you can't not answer the
4  question and then take the break, okay?
5       A.   I understand that.
6       Q.   What I would like to do is just spend a couple
7  of minutes on some preliminary matters, mostly, just to
8  get to know a little bit about your background. How old
9  are you?
10      A.   52.
11      Q.   And can you just give me a very brief
12 description of your educational background?
13      A.   My education is up to the eighth grade and
14 maybe a half of the freshman year in high school.
15      Q.   In terms of your work history, after you
16 completed half of the ninth grade, did you go to work?
17      A.   Yes. I worked a lot of factory jobs, stuff
18 like that, unskilled labor.
19      Q.   Can we just go chronologically, to the best of
20 your recollection, through your work history, as well as
21 you can remember? I don't need exact years or whatnot.
22 You know, start with, say, when you were 20 years old
23 and move over the last 30 years or so.
24      A.   Okay. At 20 years old, I worked for McDermott
25 Chevrolet in Bridgeport as the used car lot -- what they

Page 7

```
 1   call "lot boy," washed the cars, waxed the cars, make
 2   sure they had gas, stuff like that, clean cars, worked
 3   there for probably two years.  And I worked at
 4   Bridgeport Bedspring, assembling foldaway beds, working
 5   a machine, a rivet machine.  And I worked there for
 6   approximately two years.  And then I worked at Fermont
 7   Building Defense Generators, probably two years again.
 8           I was unemployed for probably two to three
 9   years, and then I went to work for Derr Plastics of
10   New York, which was located in Bridgeport, Connecticut.
11      Q.   So that is around -- we are up to about 1980
12   at this point?  Does that sound about right?
13      A.   Yeah, yeah, something like that, '79, '80,
14   something like that.  Then I went to work for Union Camp
15   in Newtown, Connecticut, and I held that job for nine
16   years.
17      Q.   What did you do Union Camp?
18      A.   I put together prototype machines for making
19   boxes, containers.  They call them corrugated
20   containers, and they put me on this new one that it
21   needed to be -- all be timed.  I am mechanically
22   inclined, so that is what I did for them.  And I ran
23   machines.  You know, I was a machine operator, you know,
24   with a crew.
25           Now, that should bring us up to about '89, and
```

```
 1   in '89 -- my employment has been very sporadic since
 2   then, a lot of odd jobs.  I worked for Inus Construction
 3   out of New Milford for probably a year, a year and a
 4   half, and then I worked for Apex Roofing for probably
 5   another year, year and a half.  And then I have been
 6   doing my own jobs, you know, doing house repairs,
 7   roofing, painting, and things like that.
 8        Q.   So for the last ten years or so, say from
 9   around '93, '94, to present?
10        A.   Yes -- no, I would say even longer than that.
11   It was '89.  I got divorced in '89, and that is when --
12   right after that is when the boss from Apex Roofing
13   died, and I had to go on my own, because he died, you
14   know, and there was no more business.  And I had to do
15   what I had to do, so I went on my own and found work and
16   started to network with people and get to know people in
17   the business.
18        Q.   So the work that you have been doing for the
19   last ten plus years -- correct me if I am wrong -- is
20   mostly in the home improvement area?
21        A.   Yes, home maintenance.  I specialize in
22   roofing and in rot damage, preparing houses for
23   painters, replacing the -- you know, like rotted wood on
24   the house before they have to do it.  You know, they
25   don't have a carpenter, I get a call, and I go and I put
```

```
 1   on the corner boards and the fascia boards and redo
 2   their gutters and stuff like that, prepare the house for
 3   them to come in and paint.
 4        Q.   Is this a business that you operate in your
 5   own name or does it have a different name?
 6        A.   Well, it is like an unofficial business.  I
 7   call it J. Stuart's, and it is a feast/famine business
 8   where, you know, I will get three calls one month, and
 9   then I won't get another call for another two months.
10        Q.   Sure.
11        A.   And then but somebody else will call me that
12   knows me, and I will go do a roof for somebody.  It is
13   that kind of a -- I have my own truck, my own tools,
14   stuff like that, so I am prepared to do, you know, just
15   about anything except for electric and plumbing.
16        Q.   So you do business as J. Stuart?  It is not
17   that it is a corporation or partnership?
18        A.   No.  It is just me.
19        Q.   Are you licensed with the State of Connecticut
20   as a home improvement contractor?
21        A.   License is pending when they cash the check.
22   I just -- I just sent in for that recently.  I didn't
23   know what you had to do to do that, and I just found out
24   what you had to do, so they sent me the papers from
25   Hartford.  I filled out the papers and sent in the
```

```
 1   check.  So I don't know how long it takes.
 2        Q.   That is a new application?  This is the first
 3   time you have applied for that license?
 4        A.   Yes.  I didn't know what you had to do, and
 5   somebody told me, this is what you have to do.  So I did
 6   it.
 7        Q.   Present in addition to you and I today, the
 8   record will reflect that Stanley Chance also accompanied
 9   you to this deposition.  How is it that you know
10   Mr. Chance?
11        A.   Mr. Chance rented a room from me, and I got to
12   know Mr. Chance.  And he had some -- that is when I had
13   told him about what was going on with me.  And at that
14   time, I didn't know what to do, and I had already seen a
15   lawyer, and the lawyer didn't know what to do.  So it
16   was probably a year after I seen the lawyer that I was
17   telling Stanley of the situation, and he says, "Well,
18   you are a good guy.  I will help you where I can."
19             And he is not an attorney, but you know, he
20   does -- he understands the stuff better than I do.  I am
21   not a -- I am not, you know, well educated or -- you
22   know, I work with my hands, not with my -- I don't
23   understand the stuff, simple.  He understands more than
24   me, and I have learned that in life, when somebody
25   understands more, you ask for the help.  And so he has
```

Page 11

```
 1   been helping me.
 2       Q.    Fair enough.
 3             MR. DONOFRIO:  Can we mark this as
 4   Defendants' A please?
 5             (Defendants' Exhibit A:  Marked for
 6   Identification - described in Index.)
 7       Q.    Mr. Stuart, I am handing you what has been
 8   marked as Defendants' Exhibit A for identification,
 9   which is the notice of deposition that brings us all
10   here today.  If you could just take a look at it and
11   verify it is what you received in the mail from us.
12       A.    Okay.
13       Q.    You recognize Exhibit A, dated February 10th,
14   2004, as the notice of deposition for today?
15       A.    Yes.
16       Q.    The last page of Exhibit A, Mr. Stuart, is a
17   list of documents that I asked you to bring today.  And
18   what I am going to do is just take a few minutes and go
19   through one by one and just identify what it is that I
20   asked for and ask you whether you have anything that is
21   responsive, okay?
22       A.    Okay.
23       Q.    The first item requests "Any and all documents
24   concerning any telephone service or telephone account
25   authorized or opened by you since January 1, 1995."
```

Page 12

1             Did I read that correctly?
2       A.    Yes.
3       Q.    Did you bring any documents with you that are
4  responsive to that request?
5       A.    No.  I have no documents.  The phone -- the
6  phone in the house where I live is under Elizabeth
7  Stuart's name.  For a brief time, I moved to Southbury
8  to take care of my children, and I did open a phone in
9  my name from the Woodbury Telephone Company.  I am not
10 sure exactly what years that was.  But I did have a
11 phone for almost a year with Woodbury Phone Company, and
12 I do not have those documents with me today.
13      Q.    Okay, fair enough.
14      A.    I have to go to Woodbury and go through that
15 to get them.
16      Q.    That is not necessary.  Number 2, "Any and all
17 documents that in any relate to the claims or defenses
18 in the litigation."
19      A.    Yes.
20      Q.    What did you bring with you in response to
21 that?
22      A.    Okay.  What I have managed to get -- people
23 are not forthcoming with written stuff for me.  I don't
24 know if that is the way it is, but what I have here is
25 letters from two different companies who I have done

```
 1   work for.  One is Domus Construction, which is a company
 2   in Bridgeport and does a lot of work in the Southern
 3   Fairfield County area.  They build houses and additions
 4   and stuff like that, and I do have one, but the man says
 5   that he could not put down -- there was no way that he
 6   could write down what I would have earned because of
 7   bidding, but the man does like my work.  And the only
 8   reason why I am not allowed to bid him anymore is
 9   because of insurances.  And so that is this letter.
10        Q.   Okay.
11        A.   I have one 1099 from him, when he tried me,
12   and he liked my work.  And one job grossed me -- I think
13   it was $3,500 on one job.  That is not profit.  That
14   is --
15        Q.   I understand.  You were paid --
16        A.   I am trying to be, you know, straight up and
17   honest.
18        Q.   Sure.
19        A.   And he was willing to write this letter for
20   me.
21        Q.   Okay.
22        A.   Another one is Winnick Construction.  It is in
23   the car.  All right, I have one from Winnick
24   Construction, which is in Monroe, Connecticut, who his
25   specialty is prepping houses for painters.  That is his
```

```
 1   main job, and he gave me some work to do.  He liked my
 2   work, but he couldn't keep me going because of insurance
 3   reasons.  I couldn't give him the liability insurance,
 4   which he needed to cover, that which would have made me
 5   a subcontractor.  I couldn't be his employee, but I
 6   could be a subcontractor to him.  And both Domus
 7   Construction and Winnick Construction will accept any
 8   phone call as far as what type of person I am, you know,
 9   and things of that nature, but as far as putting into
10   writing an exact or even a ball park amount, they can't
11   do it because there is other roofers and other people
12   that bid jobs.
13              Evans Insurance on Barnum Avenue in Stratford,
14   Connecticut, is my insurance man for business.  I have
15   had him for four years at one time.  And I was insured
16   from The Hartford.  And when I started on my own again,
17   I went to David Evans, and David Evans says he could not
18   insure me because the insurances go by your credit
19   history.  But David Evans is not forthcoming with a
20   letter to me.  Documents --
21        Q.   Again, not to interrupt you -- remember, we
22   are going to go one by one.  So right now, I guess what
23   I am saying is aside from this letter, which I am going
24   to mark in a minute, from Domus Constructors, D-O-M-U-S,
25   dated March 16th, 2004, are there any other documents
```

```
 1   that you would like to produce in response to Item
 2   Number 2 on this Schedule A?
 3              THE WITNESS:  Is there one in the car or
 4   no?
 5   A.   I would like to produce them.  I cannot
 6   produce them at this time, and I will -- they are
 7   forthcoming.  Is that satisfactory?
 8   Q.   I am not sure I know what is forthcoming, a
 9   letter from Winnick Construction that you mentioned?
10   A.   I have Winnick Construction's letter.  I don't
11   have it right here in this pile of papers.
12   Q.   If you would like to send Mr. Chance to the
13   car to get it, that is fine with me.
14              THE WITNESS:  Is it in the car?
15   A.   It might be in the car.  It may have been left
16   back at the house.
17   Q.   Moving to Item Number 3, "Any and all
18   documents that relate to the compensatory damages that
19   you are seeking."
20              Do you have with you today any documents that
21   relate to compensatory damages?
22   A.   I don't understand what that means.
23   Q.   Compensatory damages that you are in your
24   lawsuit against SNET seeking compensation from them for
25   damages that you claim?
```