Exhibit B

1    A.    I would like -- as of this time, if I could
2    have a minute to look at these papers.
3    Q.    Sure, no problem at all.
4              MR. DONOFRIO: Off the record for a
5    minute.
6              (Off the record discussion.)
7    Q.    So the question that I have asked that you
8    asked to go off the record to review documents so you
9    could properly answer is Number 3, which requests that
10   you produce any and all documents that relate to the
11   compensatory damages you are seeking.
12             Based on the review of the documents you
13   brought with you today, did you bring any documents that
14   are responsive to Item 3?
15   A.    I do not think that I have these documents in
16   my possession right now today. I do have them. They
17   are written down, but it seems to have gotten left back
18   in Bridgeport. What I have is the agent's name, his
19   phone number, and his extension number from Capitol One.
20             I am trying to take a loan against my house,
21   and what this shows is that the percentage rates and the
22   closing costs that I would have to pay to take this loan
23   are up to a point and a half higher than a normal rate.
24   Plus on top of that, I have to pay SNET the amount that
25   they say I owe them in order to secure this loan. And

1   that is what the papers are about.
2        Q.   When did you apply for the loan to Capitol One
3   that you just described?
4        A.   This loan was applied for in the past month
5   because I did not -- I have talked to people verbally,
6   and they have told me my situation, but because of this
7   deposition, I have applied so that I could have actual
8   paperwork of it.  You know, this was all done over
9   telephones, and I actually asked people, "Well, all
10  right, this is what I need.  This is my situation."  I
11  explained it to them and --
12       Q.   So what you are saying is -- this notice of
13  deposition is dated February 10th, correct?
14       A.   Yes.
15       Q.   And so in the last six weeks or so, since you
16  received the notice of deposition, and you understood
17  that we were looking for certain documents, you have
18  gone out to try to obtain those documents that are
19  responsive to our request?
20       A.   Yes.  That is exactly what I have done.
21  Before that time, nothing was on paper.  It was just
22  told to me, and I do not understand the system, how it
23  works.  And so once I knew that I had to produce papers,
24  then I did my best to get the papers.
25       Q.   Do you have any documents that are responsive

```
 1   to Item 4, which requests documents that relate to the
 2   punitive damages you are seeking?
 3        A.   I would like you to explain "punitive,"
 4   please.
 5        Q.   In your complaint, which -- withdrawn.
 6             MR. DONOFRIO: Before we do that, can we
 7   just mark the letter as Defendants' B, the March 16,
 8   2004 letter from Domus Constructors, please?
 9             (Defendants' Exhibit B: Marked for
10   Identification - described in Index.)
11             MR. DONOFRIO: If we could mark this
12   document as Defendants' C.
13             (Defendants' Exhibit C: Marked for
14   Identification - described in Index.)
15        Q.   Mr. Stuart, I am handing you what has been
16   marked as Defendants' Exhibit C for identification. I
17   submit to you that is the complaint that you have filed
18   against the Defendants in this case, correct?
19        A.   Yes.
20        Q.   In the second to last page of your complaint,
21   page 6 of Exhibit C, in Paragraph E, you seek $2 million
22   in punitive damages.
23        A.   Yes.
24        Q.   So my use of the phrase "punitive damages" in
25   Item 4 in the request for production set forth in
```

1   Defendants' Exhibit A is derived from your use of the
2   phrase "punitive damages" in your complaint.
3       A.   Okay, I understand.
4       Q.   My question is -- I'm sorry.
5       A.   I now understand what the -- "punitive" means
6   what happened to me personally?
7       Q.   No.  Punitive damages are damages that you
8   seek to punish the Defendants for the conduct that you
9   allege they engaged in.
10      A.   Okay.
11      Q.   And my question is, do you have any documents
12  that support your request for punitive damages?
13      A.   No, I don't.  I have what documents I have
14  turned in.  The punitive damage is a punishment to SNET
15  because of the -- because of what they have actually
16  done in preventing me from making a good living.  I have
17  showed my work history is good and I am a skilled
18  person, but I cannot work for a decent company.  But
19  giving in those documents -- I cannot get insurance
20  because of this.
21           I have -- not with me now, because it was also
22  left, I guess, in the briefcase, is how I am not -- how
23  I am being stressed out from a daughter that I have in
24  Roger Williams College, who I cannot help financially
25  except for a couple of hundred dollars here and there.

```
 1   And I have her W-2 forms, that she has had to work two
 2   part-time jobs in order to stay in college, along with
 3   her loans.  And her dad cannot give her anything, not
 4   that her dad is responsible for all of it, but I can't
 5   even give her, let's say, a third of what she asks for,
 6   you know.
 7               MR. DONOFRIO:  Just if I could, off the
 8   record.
 9               (Off the record discussion.)
10        Q.   If we could, Mr. Stuart, so we are not here
11   all day, if you could focus on answering the questions
12   that I ask, we will get to the allegations of the
13   complaint and whatnot.
14        A.   All right.
15        Q.   I just want to get through this initial notice
16   of deposition.  So if you don't have documents, just
17   say, "I don't have documents."  If you do, just tell me
18   that you do.
19        A.   You would rather have --
20        Q.   Go one by one.
21        A.   You would rather have "yes" and "no" answers
22   than explanations.
23        Q.   If you can answer the question with a simple
24   "yes" or "no," then just do that, okay?
25        A.   Okay, I understand.
```

```
 1    Q.   So in response to Item 4, you do not have with
 2   you any documents that support a punitive damages claim,
 3   correct?
 4    A.   No, I do not.
 5    Q.   In Item Number 5, we asked you to bring with
 6   you any and all documents that pertain to your
 7   allegation that SNET has been harassing you.
 8    A.   No, I do not.
 9    Q.   No documents that support that?
10    A.   No, I do not.
11    Q.   Item Number 6 requests that you bring with you
12   any and all documents that pertain to your allegation
13   that, quote, "Employees within the SNET office were
14   working from within the company to defraud," close
15   quote, you.
16    A.   The documents are self-explanatory in my bill
17   that SNET says I owe.  So that document should already
18   be here, opening two telephones in my name the same day
19   and closing them the same day, and letting a bill run so
20   high.  So that is my documentation to employees within
21   SNET working from within the company.
22         I don't know if this was a friend of somebody
23   or whatever, but I don't see how this happened.  That is
24   my answer on that one.
25    Q.   Who were the employees within SNET that you
```

1    claim were working to defraud you?
2         A.   A Mrs. Debra Stanley -- I believe is who is on
3    here -- is the person that I spoke to about my bill.
4    And I could not get any satisfaction or have this
5    removed.
6         Q.   You said "employees," which is plural.  Who
7    were the other employees besides Mrs. Stanley that you
8    claim defrauded you?
9         A.   Well, whoever -- unknown to me, the name of
10   the person that took the -- who took -- who originally
11   opened the phone service.  Somebody had to be there to
12   open that phone service, and whoever actually opened
13   that phone service is also one of the people.
14        Q.   That is the entire basis for your claim
15   against the other unnamed people, that they opened an
16   account in your name, so they were intending to defraud
17   you?
18        A.   Yes.
19        Q.   Item Number 7, any and all documents that
20   pertain to your allegation that, quote, "There is a
21   conspiracy at SNET to rob you."  Did you bring any
22   documents with you today that support your conspiracy
23   theory?
24        A.   No.  I do not have documents.  They are -- I
25   consider the documents that we answered in line 6 is the

1  same conspiracy on dealing with the bureaucracy of a
2  phone company, and I just -- nobody seems to want to
3  take responsibility for this.
4       Q.   Do you have any evidence that Debra Stanley
5  had anything to do with the opening of your phone
6  accounts?
7       A.   No, I do not have it. With Debra Stanley,
8  what I have about Debra Stanley is she was a -- I am
9  under the impression like a supervisory position, and
10 that is why she was the one that was answering my
11 questions.
12      Q.   And your first contact with Debra Stanley --
13 correct me if I am wrong -- came after you complained to
14 SNET that the bills were not for the your phone
15 accounts?
16      A.   Yes.
17      Q.   Prior to that time, you never had any contact
18 with Debra Stanley, correct?
19      A.   Right.
20      Q.   Debra Stanley was not trying to collect the
21 bill from you?  She was responding to your concerns
22 about the accounts, correct?
23      A.   Yes.
24      Q.   Likewise, Item Number 8, that inquires and
25 requests you produce any and all documents that pertain

Page 24

1   to your allegations against Debra Stanley. Are those
2   covered in the correspondence that you previously
3   referenced?
4       A.   Yes. They are covered, line 6, 7, and 8.
5       Q.   Item Number 9 asks you to produce any other
6   documents that you intend to offer as evidence in this
7   litigation.
8       A.   I have no documents.
9       Q.   Item Number 10 requests that you produce
10  federal income tax returns filed by you from 1998
11  through tax year 2003. Did you bring any tax returns
12  with you?
13      A.   No. I do not have any tax returns. I have
14  not made enough money to even file tax returns.
15      Q.   So in the 1998 to 2003 time frame, you have
16  never filed a federal income tax return?
17      A.   Never filed a federal income tax return.
18      Q.   When was the last time you filed a tax return?
19      A.   In '96, I believe.
20      Q.   Do you recall what the gross income that you
21  claimed in the '96 return was? I know it was eight
22  years ago.
23      A.   I think it was something about 20, 26,000,
24  something like that.
25      Q.   Item Number 11 requests that you produce "Any

```
 1   and all loan applications, applications for credit made
 2   by you, as well as any and all letters denying the loans
 3   or credit to you."
 4              Did I read that correctly?
 5        A.    Yes.  I do not have those documents with me.
 6        Q.    Have you ever been denied credit?
 7        A.    Yes -- no.  Excuse me.  I have not been denied
 8   credit.  I am in a high risk pool, so my rates -- there
 9   are people that offer credit at banks and things like
10   that, which is a normal person's life.  There are other
11   people who have bad credit who can get credit, but they
12   have to pay the high rate, high risk, whatever.  And so
13   I have not been denied it, but I do not think that I
14   have to pay 24 percent rather than the 5.
15        Q.    How many applications for credit have you made
16   in the last five years?
17        A.    I haven't made any.  I must have been sent 20.
18        Q.    In the mail?
19        A.    Yes.
20        Q.    So you are talking about those just direct
21   mail marketing pieces from different institutions?
22        A.    Yes.  I have already been told by the bank,
23   People's Savings Bank, which is where I do business,
24   that until this issue is cleared up, that they cannot
25   help me, and that is a normal way of doing business, is
```

```
 1   with the bank.
 2        Q.   Have you made an application to People's Bank
 3   for credit?
 4        A.   No.  This was said to me verbally.  I own a
 5   house that is paid for.  I went to get an equity line of
 6   credit.  I could not get the equity line of credit
 7   because they told me that I would have to pay SNET the
 8   money I owed them, so that they could be first in line.
 9   I don't know exactly how they said it.  They didn't want
10   me to owe anybody money except them.  And I refused at
11   that time to pay SNET the money they say I owed them.
12        Q.   Item Number 12 requests any and all credit
13   reports issued with respect to the Plaintiff, which is
14   you.  In other words, do you have any credit reports?
15        A.   Yes, I do.  I have -- not with me, left in
16   Bridgeport in the briefcase.  I do have credit reports,
17   not today.
18        Q.   Is there a reason why you didn't bring them
19   with you?
20        A.   They were all neatly packaged in a briefcase.
21   And I went and picked Mr. Chance up this morning, and
22   after coming here and opening the package, he did not
23   have the briefcase.
24        Q.   How many -- go ahead.  I'm sorry.
25        A.   We actually have like a leather briefcase,
```

1  official stuff. You know what I mean?
2      Q. How many credit reports do you have in your
3  possession of your own credit reports?
4      A. I have two of the same, one at one time and
5  one at another time.
6      Q. What are the dates of the reports, year-wise?
7      A. I don't know. They were within the last three
8  years. In fact, I think -- I don't want to give an
9  exact date -- it was the summer of last year when I met
10 a real estate agent, and she did a credit report for me
11 because she had a private lender. And when they seen
12 that -- but they actually gave me a copy and said this
13 is what your problem is.
14     Q. Aside from the SNET issue, is it your position
15 that there is no other negative credit history on your
16 credit report?
17     A. I have a 189-dollar bill for an ambulance
18 service to my mother, which I thought Medicare took care
19 of, and it ended up on my credit report. I have a
20 75-dollar check that bounced to Home Depot, and I have
21 both my sons, who used -- who both have -- you know, my
22 son is -- my oldest son is James Thomas Stuart but goes
23 by the name of Tom. But when he took Yankee Gas in the
24 Danbury area, he used James Thomas Stuart, not my
25 Social, but his own Social, and that has ended up on my

1  credit report to about $400. And my son Scott, somehow
2  his ended up on my credit report to the tune of about
3  600, or Tommy is the 600, and Scott is the 4. It totals
4  about a thousand dollars.
5         And I have gotten my son Tom's and Scott's
6  credit report, and that also shows on their credit
7  reports, the same bill. And I have been in contact with
8  Yankee Gas, and they are trying to give me a settlement
9  of a lesser pay to end it. And that is what is on my
10 credit report.
11        I had a home in Southbury, Connecticut, at one
12 time when I was married. That is on my credit report.
13 That is a good part, you know, a mortgage. I bought a
14 truck back when I was married. That is on my credit
15 report. That is a good -- there is good things, but
16 those are -- the total is probably about $6,000 that I
17 owe to even my credit. Almost 5,000 of that -- I don't
18 know exact figures -- is SNET. So I hope that answers
19 your question.
20     Q.   Yes. Will you send me those credit reports?
21     A.   Yes.
22     Q.   If you could do it right away, I would
23 appreciate it.
24     A.   Yes, I will.
25     Q.   And the last item that we requested was any

```
 1   documents you intend to offer as evidence at trial.  I
 2   assume that you have produced to us everything that you
 3   have.  That is what you have told us today?
 4        A.   Everything up to the present.  If I understand
 5   the procedure a little more, and if more documentation
 6   is needed, then I could go out and try to get more
 7   documentation, but people are not forthcoming to write
 8   letters for me.
 9        Q.   Why don't we spend a few minutes now -- you
10   can put that exhibit to the side.  We are done with it,
11   and we will talk about your complaint, which is
12   Defendants' Exhibit C, this document.  As we talked
13   about, this is the current complaint in the case, the
14   only complaint in the case, correct?
15        A.   Yes.
16        Q.   And if you turn to page 2 of Exhibit C, the
17   first paragraph, "Jurisdiction," says, "The District
18   Court has jurisdiction over this complaint pursuant to
19   47 USC Sections 206 and 207."  Correct?
20        A.   Yes.
21        Q.   Do you know what that means?
22        A.   No.  I have a friend who has been helping me.
23   I do not understand -- I have a hard time understanding
24   the printed word.
25        Q.   Under the first paragraph, "Understatement of
```

Page 30

```
 1   Claims," still on page 2, you allege that SNET opened
 2   two phone accounts in your name without your knowledge,
 3   consent, or authorization.
 4              Did I read that correctly?
 5   A.   Yes.
 6   Q.   When did you find out that there were two
 7   phone accounts opened in your name?
 8   A.   I found out when Christopher Shea, who is the
 9   owner of Domus Construction, said he needed to get in
10   touch with me and stay in contact, took me in his
11   vehicle to get a cell phone for me.  And that is when I
12   found out that I had this bill, which was very
13   embarrassing, because this was a guy who really wanted
14   me to work for him.  And I produced that, and that is
15   when I first found out that I had this bill.
16   Q.   When approximately was that; do you remember?
17   A.   No, I don't.  It was -- it was probably a
18   month or two months, approximately, to my response with
19   my driver's licenses.
20   Q.   Prior to that, you mean, a couple months
21   prior?
22   A.   Yes.  I had found out about it and talked to
23   another friend of mine, who told me to go to this
24   attorney, and he might help me.
25   Q.   Turning to page 3 of your complaint,
```