Exhibit
B

STUART v. SNET

March 23, 2004

Page 31

1    Exhibit C, in Paragraph 4, you allege that you have

2    never lived in Ansonia or Derby in your life, correct?

3        A.    That is correct.

4        Q.    Have any of your children ever lived in

5    Ansonia or Derby?

6        A.    None of my children have ever lived in Ansonia

7    or Derby.

8        Q.    In Paragraph 7, you allege that SNET wants you

9    to pay the phone bills and that they have been harassing

10    you to pay them since January of 2000; is that correct?

11        A.    Yes.

12        Q.    So would January of 2000 be when you learned

13    that you had the phone bills on your credit report?

14        A.    No.  I think I learned in '99.  I think it was

15    '99 or '98.  We have to refer back to my original

16    response to the lawsuit.  When that date was after that,

17    I consider me being -- I am being harassed by them not

18    taking action to remove this from my record.  I cannot

19    take a loan on a paid up house because of this, so I

20    consider this to be harassing me.  It is just sitting

21    there, waiting.

22        Q.    So it is not a question of SNET calling you or

23    sending you collection letters that forms the basis of

24    the harassment claim?  Your claim that they harassed you

25    by not doing anything to take it off your credit?

SANDERS, GALE & RUSSELL                    (203) 624-4157

Page 32

1        A.    Yes.  By -- after calling and doing everything

2    that I could possibly get as paperwork for them, which

3    includes all my licenses and stuff like that, my

4    explanation that I lived with my mother, they wanted a

5    utility bill.  The explanation was given, and I was

6    just -- "Well, you don't have it.  You owe the bill."

7              And it is like, "But I don't owe the bill.

8    Please look at this."  And that is where I considered

9    that harassment.

10        Q.    Paragraph 8, which starts on the bottom of

11   page 3 and continues on the top of page 4, you claim

12   that you haven't been able to get insurance for your

13   business or the insurance that you have been able to get

14   is too expensive and resulted in the loss of over

15   $30,000 worth of jobs and contracts, correct?

16        A.    Yes.

17        Q.    Do you have any evidence or can you share with

18   me how you calculated these lost jobs?

19        A.    How I calculate these lost jobs is my main job

20   is -- I am very good on the roof.  I am an excellent

21   leak repairer and finder.  My skills for prepping

22   houses, if this was to net -- if this was to gross me

23   $10,000 in a year, which one job grosses me 3,500, I am

24   saying that I should have had at least three jobs a

25   year.  So I think as a very minimum, that I should have

STUART v. SNET

1   had at least three jobs a year, which would save $10,000

2   a year of income I have lost because of me not being

3   able to work for a legitimate company.  And I minimize

4   that.

5        Q.    What is the average number of jobs you do in a

6   year?

7        A.    I would say that I work almost ten months out

8   of a year, maybe three to four days a week in those

9   months.  I have just finished a project that took eight

10  weeks to do a complete remodel of an apartment, and the

11  gross was $26,000.  I did work where four days of

12  roofing work grossed me $10,000.

13       Q.    Are we talking about 2003 now?

14       A.    I am talking about within the last six months.

15  It is not an exaggeration to say that I could put a

16  profit of about 1,500 to $2,000 a week in my pocket from

17  my roofing job.

18       Q.    But you have never done that?

19       A.    Yes, I have.

20       Q.    How can you have a profit of 1,500 to $2,000 a

21  week but never make enough money to file a federal

22  income tax return in the last eight years?

23       A.    This has been in the last year.  This has

24  been -- I can get papers on this, of the guy I worked

25  for.  It happens to be one client who owns three houses

STUART v. SNET

1   and likes my work, and he is willing to overlook me not

2   having insurance.  And the reason why I don't end up

3   with all that money per se to go out and buy something

4   is because I take care of my mother, who I have to pay

5   the nursing bills for any time out of that house.  I

6   have full-time care for her, which costs me probably --

7   what is it, 1,600 a month for her, plus her bills and

8   this and that, which we just got Title 19.  So that has

9   eased up.  I only have to pay the $160 for the Saturday

10  and Sunday, because Title 19 doesn't cover that.  So I

11  have to still pay out of my pocket.

12       Q.   So is it safe to say that -- withdrawn.

13            In terms of your calculation of losing

14  30,000-dollars worth of jobs and contracts, that is

15  gross?  That is not profit, correct?

16       A.   That is gross, yes.

17       Q.   What would the profit be on that $30,000?

18       A.   I would say it would be a third, because that

19  is about what roofing works out to be, is about a third.

20       Q.   Looking at Paragraph 10, still on page 4 of

21  Exhibit C, you state, "I believe and the evidence will

22  show that employees within the SNET office were working

23  from within the company to defraud me."

24            Did I read that correctly?

25       A.   Yes.

STUART v. SNET

March 23, 2004

Page 35

1    Q.   And does that go back to what we talked about

2    earlier?

3    A.   Yes.

4    Q.   You don't have any evidence that they were

5    trying to defraud you, but you believe that because they

6    didn't do anything to take this off your bill or take

7    this off your credit report, that that is what they were

8    up to?

9    A.   Well, what I believe is that this account --

10   which in my opinion, I have never known anybody to have

11   a bill like this from a phone company -- should have

12   been red flagged, if I am saying it right, or should

13   have been noticed by somebody.  And so their lack of

14   doing anything has caused me problems.  So I consider

15   that their lack of not doing anything is defrauding me.

16   They don't know who I am.  They said the hell with it,

17   let that guy pay the bill, and so that is what I look at

18   as they were defrauding me.

19   Q.   So your belief that they were defrauding you

20   and your claim that they defrauded you is based solely

21   upon the fact that they didn't do anything to try to

22   collect this bill from you?  Is that what you are

23   saying?

24   A.   I am saying that they -- they are trying to

25   collect the bill from me.  It is on my credit report.

SANDERS, GALE & RUSSELL

(203) 624-4157

STUART v. SNET

March 23, 2004

Page 36

1    They stuck it on there.  They were efficient enough to

2    put it on my credit report but not efficient enough to

3    let me know about it and not efficient enough to stop a

4    3,000-dollar phone bill and a 2,000-dollar phone bill

5    opened the same day in two different towns, using my

6    name and my Social Security number over the telephone

7    without even a signature or seeing me, whatever.

8              It is just ridiculous, that whoever did

9    something like that -- I don't know how he could run a

10   business, not in today's -- not today, not how things

11   are today with identity theft and everything.  It was

12   total disregard to any rights that I might have held as

13   a citizen that they would just do such a thing, and now

14   I am stuck with this frustration for the last four

15   years, that I am aware of.

16        Q.   Again, getting back to the question as to what

17   evidence that you have and what evidence you are basing

18   your fraud claim on, you don't have any evidence that

19   any employees at SNET intentionally defrauded you,

20   correct?

21        A.   No, I do not.

22        Q.   On page 5 of Exhibit C, Paragraph 13 alleges,

23   "There is a conspiracy at SNET which involves Debra

24   Stanley to rob me."

25              Did I read that correctly?

SANDERS, GALE & RUSSELL                    (203) 624-4157

STUART v. SNET

March 23, 2004

Page 37

1    A.    Yes, you did.

2    Q.    As we discussed a few minutes ago -- correct

3    me if I am wrong -- you had no contact with Debra

4    Stanley until you contacted SNET to ask them to remove

5    these accounts from your credit report, correct?

6    A.    Correct.

7    Q.    And you have no idea, in terms of your

8    conspiracy theory, as to the identity of anyone else at

9    SNET who was involved in opening or otherwise handling

10   your accounts?

11   A.    Correct.

12   Q.    In terms of the conspiracy claim itself,

13   again, I just want to make sure for the record that I

14   understand it and that the record is clear, that is

15   based solely on the fact that Miss Stanley did not

16   resolve the problem for you?

17   A.    Correct.

18          MR. DONOFRIO: The last exhibit that we

19   are going to talk about today, I would like to please

20   have this marked as Defendants' D.

21          (Defendants' Exhibit D:  Marked for

22   Identification - described in Index.)

23   Q.    I am handing you what is marked as Defendants'

24   Exhibit D for identification, which are the Defendants'

25   First Set of Interrogatories, and there is also a

SANDERS, GALE & RUSSELL                    (203) 624-4157

1   Request for Production beginning on page 11, both dated

2   January 12th, 2004.

3            I just would like you to take a look at it.

4   Take your time.  Make sure --

5        A.   You said page 11?

6        Q.   Yes.  Make sure you recognize it.  Then we

7   will ask some questions about it.

8        A.   Yes, I am aware of this paper.

9        Q.   So you recognize Exhibit D as our January 12,

10  2004 discovery request to you, correct?

11       A.   Yes.

12       Q.   So the February 10th, 2004 notice of

13  deposition and the request for production of documents

14  we went through wasn't the first time that we have asked

15  you to produce documents or provide information in the

16  case, correct?

17       A.   Correct.

18       Q.   I just want to go through a few of the

19  interrogatories now, if we could turn to page 3 of

20  Defendants' Exhibit D, please.  Interrogatory Number 2,

21  Sub-part C, we asked you to provide us with every home

22  and business address since January 1, 1993.

23            Can you do that for me now or do you want to

24  provide that in response to the interrogatory?

25       A.   I do not have documentation now.

STUART v. SNET

March 23, 2004

Page 39

1      Q.    Well, we don't need documents.  Now we are

2    just looking for -- interrogatories don't ask for any

3    documents.

4      A.    Okay.

5      Q.    The request for production that begins on page

6    11 does, but in terms of the interrogatories, if you

7    look at Interrogatory Number 2, at the bottom of the

8    page, all we asked you to do is in C, identify your

9    addresses since 1993.

10     A.    Yes.

11     Q.    And we haven't received any responses.  You

12   objected to our interrogatories and requests for

13   production in their entirety, so that is why I need to

14   ask you these questions now.

15     A.    Well, okay.  The reason why I -- what you just

16   said is because my Social Security number is already in

17   your system.  My driver's license numbers were already

18   furnished, and my home address since January, '93 is

19   also what I showed you.

20     Q.    So your address --

21     A.    I already have done this, so it is rhetorical.

22   I don't know if that is the right word.

23     Q.    It is not rhetorical.  It is an interrogatory,

24   and the question is, so you agree with regard to Social

25   Security number that the number that is in SNET's system

SANDERS, GALE & RUSSELL                    (203) 624-4157

STUART v. SNET

March 23, 2004

Page 40

1    is the correct Social Security number for you?

2        A.    Yes.

3        Q.    And in terms of your addresses for the last 11

4    years --

5        A.    Yes.

6        Q.    -- the Gem Avenue -- or Gem Street, excuse me,

7    address in Bridgeport, is that the only address that you

8    have had since 1993?

9        A.    Yes, except for a brief time when I moved to

10   Southbury to take care of my children.

11       Q.    When was that?

12       A.    I am not sure of the year.

13       Q.    How old are your children again?

14       A.    My oldest is 28.  That is Tommy.  Billy is 26.

15   Scott is 24.  Monique is 22, to the best of my

16   knowledge.  I am not good with dates and numbers.

17       Q.    You previously testified that you have

18   actually never opened a telephone account with SNET,

19   correct?

20       A.    To the best of my knowledge.

21       Q.    Where did SNET get your Social Security number

22   from?

23       A.    What SNET told me was over the telephone.

24       Q.    I understand that, but if you didn't provide

25   them with your Social Security number, and your children

STUART v. SNET

March 23, 2004

Page 41

1   didn't open any accounts in your name, do you have any

2   explanation for how SNET obtained your Social Security

3   number?

4        A.   No.

5        Q.   Could you please turn to page 11?  We are

6   almost done, page 11 of Exhibit D.  I am not going to go

7   through all 11 requests for production set forth in

8   pages 11 and 12 of Exhibit D, Mr. Stuart, but I would

9   just ask you if you could take a look at them and tell

10  me whether you agree that they are the same requests for

11  production as are set forth on the last page of Exhibit

12  A, which is the notice of deposition.

13       A.   I'm sorry.  I just blanked out.

14       Q.   No problem.  Take a look at the request for

15  production.

16       A.   Talk to me like I am in eighth grade because

17  that is really -- you know.

18       Q.   The document that you have in front of you

19  right now -- you are on page 11, correct?

20       A.   Yes.

21       Q.   And that page has a heading of "Request for

22  Production."

23       A.   Okay.

24       Q.   And that is a request by us that you produce

25  documents to us?

STUART v. SNET

March 23, 2004

Page 42

1    A.    To you, okay.

2    Q.    And what I am asking you is when you look at

3    those requests for production, do you agree that they

4    are the same requests for production that are set forth

5    in the request for production that we already went

6    through today in your notice of deposition?  You can

7    just compare them if you want.

8    A.    I'm sorry.  I am having a hard time focusing

9    on keeping this in my head.  It appears to me to be the

10   same thing.

11   Q.    So your responses to the requests for

12   production set forth in Exhibit D would be the same as

13   your responses to the requests for production set forth

14   in Exhibit A, correct?

15   A.    I assume so, yes.

16   Q.    We have already gone through all of these

17   requests at length this morning, one by one, and you

18   told us whether or not you had any documents responsive,

19   correct?

20   A.    Correct.

21          MR. DONOFRIO:  I have no further

22   questions.  If you could just send me any documents that

23   you have that you left in your briefcase or otherwise.

24          THE WITNESS: Yes.

25          MR. DONOFRIO:  Just mail them to me.  Send

Page 43

1    them first class mail.

2                    (Off the record discussion.)

3                    MR. DONOFRIO: We are resuming the

4    deposition because of the documents that Mr. Stuart

5    thought were left back in Bridgeport are actually here.

6        Q.   Is that correct?

7        A.   What I see is what we talked about for

8    punitive -- for the reason why I am seeking punitive,

9    and one of the issues is my inability to give my

10   daughter any money to help her in college, and I have

11   her W-2 Forms or whatever W's that they are.  I have her

12   tax forms.

13                    I have -- I have letters that are emotionally

14   straining to me written to me by my daughter.  And this

15   is one of my frustrations, that I cannot -- I cannot

16   help her.  And this shows that -- maybe not in

17   documentation, but this shows what she has to do in

18   order to maintain what she wants to do in life.  And

19   what I had said previously is I am not -- I am not

20   legally supposed to have to pay anything, but as a

21   parent, and especially as a divorced parent, maybe a

22   third of what, you know, she is doing; my wife do a

23   third, I could do a third, and Monique could do a third.

24                    I think this is kind of self-explanatory.  I

25   don't know.  I am not a good talker.

STUART v. SNET

March 23, 2004

Page 44

1    Q.    Let me go through these one by one, see what

2    they are, and we will mark them.

3                    MR. DONOFRIO: Mark this as E, please.

4                    (Defendants' Exhibit E:  Marked for

5    Identification - described in Index.)

6    Q.    So Exhibit E for identification is a letter

7    from your daughter to you; is that correct?

8    A.    Yes.

9    Q.    And this doesn't have a date on it.  When did

10   you receive this?  It looks recent enough?

11   A.    Yes.  It is just since I have -- since all

12   this has happened, the last two months.

13   Q.    So this highlights the money that your

14   daughter has borrowed to pay for her education; is that

15   correct?

16   A.    Yes, along with these two other stapled

17   documents here.

18                    MR. DONOFRIO: The next document, if we

19   could mark this as Exhibit F.

20                    (Defendants' Exhibit F:  Marked for

21   Identification - described in Index.)

22   Q.    This appears to be some type of itemized

23   billing summary from Roger Williams College.  Is that

24   what it is?

25   A.    Yes.

SANDERS, GALE & RUSSELL                    (203) 624-4157

STUART v. SNET                                              March 23, 2004

Page 45

1      Q.    So this would show --

2      A.    It is from Roger Williams College.  I do not

3   understand the stuff.  That is --

4      Q.    This was sent to you by your daughter?

5      A.    Yes.  I asked her to send me something because

6   I needed to have paperwork.

7      Q.    The last document appears to be something else

8   sent to you by your daughter?

9      A.    Yes.  It was sent to me by my daughter.

10     Q.    Consisting of some records of money that she

11   earned in 2003 and jobs that she worked while she was in

12   school?

13     A.    Yes.

14     Q.    A statement from RISLA, R-I-S-L-A, of her

15   student loan balance, and some other documents related

16   to her student loans; is that correct?

17     A.    Yes.

18     Q.    And so your testimony as to why the documents

19   from your daughter, Exhibits E and F, as well as the W-2

20   and loan information, are relevant is -- correct me if I

21   am wrong -- that because you haven't been able to obtain

22   more work, you haven't had the cash to help her as much

23   as you would like?

24     A.    Yes.  I have not been able to help her, as far

25   as my employment goes, and on the other side of it, I

SANDERS, GALE & RUSSELL                       (203) 624-4157

STUART v. SNET                                    March 23, 2004

Page 46

1    can't take a loan against my house to give her money

2    because of the situation.  I am stuck both ways.

3         Q.    Have you applied for a mortgage from any bank?

4         A.    I did not apply for the mortgage because they

5    told me that the mortgage was going to cost me $75 and

6    that there was no way they were going to give me a

7    mortgage because of my credit.  So there was no reason

8    for me to apply because I was going to get rejected, and

9    then there is other fees of house inspections, which is

10   $450, and it is something where they tell you the value

11   of the house --

12        Q.    Appraisal?

13        A.    Appraisal, and then there is another one that

14   tells you what houses have sold in the neighborhood,

15   sold for.  And all that costs money.

16        Q.    How many banks have you talked to about

17   borrowing money against your house, about a mortgage?

18        A.    One bank, People's Savings Bank.

19        Q.    People's Savings Bank or People's Bank of

20   Bridgeport?

21        A.    Peoples Savings Bank of Bridgeport.

22        Q.    When did you last talk to People's Bank?

23        A.    I would say that had to be -- let's see, she

24   is in her third year now, so it was three years.

25        Q.    2001?

SANDERS, GALE & RUSSELL                    (203) 624-4157

Page 47

1      A.    Yes.

2      Q.    Is that the only time you have ever talked to

3    People's Bank?

4      A.    Yes.

5      Q.    So you asked somebody?  Who did you ask at

6    People's Bank about a loan?

7      A.    One of the loan officials, persons, the lady.

8      Q.    Did you walk into a branch?

9      A.    Yes, yes.  I went to the -- I think it was the

10   Boston Avenue branch, or it could have been the Madison

11   Avenue.  I can't picture which lady I dealt with.

12     Q.    Did you have an appointment or did you just

13   walk in?

14     A.    No, I didn't have an appointment.  I just sat

15   down because of this was going on with my daughter going

16   to college.  She is the first Stuart to ever go to

17   college, so that is when I went in to do this, and the

18   lady told me that there is nothing -- she could not help

19   me.  She said, "Mr. Stuart, I cannot help you."  She

20   says that, you know, you can't.

21     Q.    So you walked into the branch without an

22   appointment that day, correct?

23     A.    Yes.

24     Q.    And you said, "Hi, I am James Stuart, and I

25   would like to talk to you about a mortgage"?

STUART v. SNET

March 23, 2004

Page 48

1       A.    Yes.

2       Q.    And "Here is where I live"?

3       A.    Yes.

4       Q.    And what other information did you give her?

5       A.    My credit report.

6       Q.    So you handed her a copy of your credit

7    report?

8       A.    Yes.

9       Q.    And is that credit report something that you

10   are going to mail me?

11      A.    Yes, yes.

12      Q.    And so she saw your credit report, and she

13   said, "On the basis of this, I don't think we would make

14   a loan to you"?

15      A.    What she said, "If you can clear this credit

16   up, we can probably give you" -- "probably give you" --

17   "It is not a loan, a credit line against your house."

18   You get a book of checks, all right, so she could

19   probably do that.  But what I would have to do is clear

20   up this.

21            And I says, "But I refuse to pay this bill."

22            And she says, "Well, you have to pay the bill

23   in order for us to give you the money because that

24   is" -- and I said, "But I" -- you know.

25      Q.    So it wasn't just the SNET item?  It was the

STUART v. SNET                                                March 23, 2004

Page 49

1    other items as well on your credit report that you

2    talked about 20 minutes ago when we went through what's

3    on there?

4         A.    Yes, yes.

5         Q.    So you didn't even go through the process of

6    applying because you didn't want to pay the application

7    fee and spend the money if it didn't look like you were

8    going to be approved?

9         A.    Yes.  Didn't look like I was going to be

10   approved, anyway.

11        Q.    Did she ask you about tax returns?  Did that

12   come up during this?

13        A.    Yes.  I said I was self-employed, and she said

14   that they have unverified -- they had like a bunch of

15   different loans.  You know, there was this loan, that

16   loan, this loan, that loan.

17        Q.    So because you didn't have tax returns and you

18   were self-employed, that limited the types of loan

19   programs that would be available to you, even if you had

20   perfect credit?  Is that fair to say?

21        A.    Say that again, please.

22        Q.    Because you were self-employed and because you

23   didn't have any tax returns to show to whomever you were

24   applying for a loan from, that limited the types of

25   loans that you would even be eligible for, regardless of

SANDERS, GALE & RUSSELL                        (203) 624-4157

STUART v. SNET

March 23, 2004

Page 50

1    your credit?  Is that your understanding?

2        A.    Yes.  The unverified, unverified loan, they

3    have that.  They have different types of loans.  I do

4    have an accountant who has a lot of records about me.

5        Q.    Who is your accountant?

6        A.    Phil Giordano.

7        Q.    Where is he from?

8        A.    He is from New Canaan, Connecticut.

9        Q.    I was glad you didn't say Waterbury.  He is

10   your accountant?

11       A.    Yes.  He is my friend and accountant.  He

12   helps me out.  You know, he is the one that explained to

13   me, you know, what I am paying for my mom and this other

14   stuff.  What are you going to do?

15       Q.    He helps you with the Title 19 aspect of it

16   and whatnot?

17       A.    No.  I had social workers do that.

18             MR. DONOFRIO: Okay.  I have no further

19   questions.  Thank you.

20             (Deposition concluded: 11:15 a.m.)

21             (Signature waived.)

22

23

24

25

SANDERS, GALE & RUSSELL                    (203) 624-4157

# CERTIFICATE

I hereby certify that I am a Notary Public, in and for the State of

Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition

was by me duly sworn and thereupon testified as appears in the foregoing

deposition; that said deposition was taken by me stenographically in the

presence of counsel and reduced to print under my direction, and the

foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the

parties to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this _____12th_____ day of

_____April_____, 20 04

_____Patricia Saya_____

NOTARY PUBLIC

PATRICIA SAYA

My Commission Expires:

JUNE / 2005